# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **DANIEL O. CONWILL, IV,** | * | |
| | * | **CIVIL ACTION NO. 11-938** |
| **Plaintiff,** | * | |
| | * | |
| **versus** | * | **SECTION** |
| | * | |
| **GREENBERG TRAURIG, L.L.P.,** | * | |
| **JAY I. GORDON, and JOHN B. OHLE, III** | * | **MAGISTRATE DIVISION** |
| | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

## COMPLAINT FOR DAMAGES

The plaintiff, Daniel O. Conwill, IV, files this Complaint for Damages against the defendants, Greenberg Traurig, L.L.P., Jay I. Gordon, and John B. Ohle, III, upon representing as follows:

## PARTIES

1.      Plaintiff Daniel O. Conwill, IV is a person of the full age of majority, and is domiciled in the City of New Orleans, Parish of Orleans, State of Louisiana.

2.      Defendant Greenberg Traurig, L.L.P. ("Greenberg") is a limited liability partnership law firm organized under the laws of New York with offices in Albany, Amsterdam, Atlanta, Austin, Boston, Chicago, Dallas, Delaware, Denver, Fort Lauderdale, Houston, Las Vegas, Los Angeles, Miami, New Jersey, New York, Orange County, Orlando, Palm Beach County North, Palm Beach County South, Philadelphia, Phoenix, Sacramento, Shanghai, Silicon Valley, Tallahassee, Tampa, Tokyo, Tyson's Corner, Washington, D.C., White Plains, and Zurich, with "Strategic Alliances" in Berlin,

Brussels, London, Milan, and Rome. Greenberg does not maintain a principal place of business in Louisiana, and none of the constituent members of Greenberg are domiciled in or a citizen of Louisiana; hence, Greenberg is not a citizen of Louisiana.

3.      Defendant Jay I. Gordon (collectively with Greenberg, "the Greenberg defendants") is a person of the full age of majority, and is domiciled in the City of Saddle River, State of New Jersey. Gordon was a shareholder of Greenberg from 1996 to 2004, working in Greenberg's New York office, and from January 2003 until Fall 2004 was the global chair of Greenberg's tax department.

4.      Defendant John B. Ohle, III is a person of the full age of majority, whose domicile is in the City of Wilmette, County of Cook, State of Illinois. Although Ohle is currently a resident of the Federal Prison Camp in Pensacola, Florida, filings in the criminal proceedings against Mr. Ohle indicate that it is his intention upon completion of his prison sentence there to return to his domicile in Wilmette, Illinois. Regardless, Mr. Ohle is not domiciled in, nor a citizen of, Louisiana.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this civil action pursuant to 18 U.S.C. § 1332. The plaintiff is a citizen of the State of Louisiana, and no defendant is a citizen of the State of Louisiana, such that there is complete diversity among the parties; and the amount in controversy in Mr. Conwill's claims exceeds $75,000.00.

6.      Upon information and belief, at all material times relevant hereto and beginning at least in December 2002 and continuing through the present, the Greenberg defendants regularly transacted business in the Parish of Orleans, State of Louisiana, regularly entered into contracts to supply services within the Parish and State, caused tortious injury within the Parish and State by their acts

2

and omissions, regularly solicited business within the Parish and State, and derived substantial revenue from services rendered to citizens of the Parish and State.

7.     More specifically, as alleged in detail below, the Greenberg defendants directed intentionally fraudulent communications to Mr. Conwill in Orleans Parish, State of Louisiana, which communications give rise to Mr. Conwill's causes of action. These communications include, but are not limited to, multiple drafts of an opinion letter issued to Mr. Conwill dated October 10, 2003, and a letter to Mr. Conwill dated April 7, 2004, which letters contained knowing misrepresentations and deliberate fraud regarding the tax implications of a transaction entered into by Mr. Conwill upon the basis of the advice for which he had retained the Greenberg defendants. Both letters were signed by Mr. Gordon, on Greenberg letterhead, in the course of Greenberg's purported representation of Mr. Conwill, and in furtherance of the Greenberg defendants' scheme and enterprise with Mr. Ohle. The contents of these communications, giving rise to Mr. Conwill's claims herein, constitute purposeful availment of the benefits and protections of Louisiana law.[1]

8.     At all material times hereto Mr. Ohle regularly transacted business in the Parish of Orleans, State of Louisiana, regularly entered into contracts to supply services within the Parish and State, caused tortious injury within the Parish and State by his acts and omissions, regularly solicited business within the Parish and State, and derived substantial revenue from services rendered to citizens of the Parish and State.

---

[1]     *See Conwill v. Greenberg Traurig, L.L.P., et al.*, No. 2009-4365, Order (Doc. No. 32) (Dec. 22, 2009) (denying Rule 12(b)(6) motion to dismiss for lack of personal jurisdiction), at p. 11-14, 2009 WL 5178310, *6-7 (finding the multiple drafts of the October 10, 2003 opinion letter to be sufficient to constitute "purposeful availment of the benefits and protections of Louisiana law.").

3

9.     Mr. Ohle also specifically directed numerous communications to Mr. Conwill, which communications constituted the intentional acts from which arise Mr. Conwill's claims herein, and thereby constitute purposeful availment of the benefits and protections of Louisiana law.

10.     Venue lies in this district pursuant to 28 U.S.C. § 1391. As set forth above, Defendants at all material times conducted substantial business in this district. Defendants transact or have transacted their affairs in this district, and their concerted conduct, upon which this action is founded, was directed at and intended to injure Plaintiff in this district.

11.     Defendants, either on their own or through their agents, conspired to commit within the State of Louisiana certain of the wrongful acts alleged in this Complaint for Damages and/or committed or participated in the commission of those acts within or without the State of Louisiana, purposefully directing their wrongful acts toward the forum of Louisiana, causing in Louisiana, directly or indirectly, the intentional and deliberate commission of the acts that serve as the basis for the plaintiff's causes of action set forth herein.

12.     Plaintiff seeks disgorgement of the unethical, excessive, and illegal and fraudulent fees and kickbacks paid to the defendants, jointly and *in solido* with other unnamed co-conspirators, plus compensation for all other damages sustained, including without limitation all fees and costs he has incurred responding to the federal and state tax agencies as a result of the defendants' breach of fiduciary duty through the deliberate and intentional commission of fraud against Mr. Conwill, and any additional amounts, such as taxes, interest, and penalties, that have been and may be assessed against him by federal and state tax agencies, the total of which is in the millions of dollars, all of which damages must be trebled under the Louisiana Racketeering Act, La. R.S. § 15:1356(E). Plaintiff also seeks all attorneys' fees and costs incurred in this matter under the Louisiana

4

Racketeering Act. Finally, pursuant to Louisiana Code of Civil Procedure article 3546 and/or 3547, Plaintiff seeks punitive damages under New York law. These damages far exceed $75,000.00.

## FACTUAL BACKGROUND

13.     The allegations contained in paragraphs 1 through 12 of this Complaint for Damages are incorporated herein by reference.

14.     The defendants, along with certain unnamed co-conspirators (the "Enterprise," sometimes referred to individually as "Members of the Enterprise" or "Members") entered into various arrangements amongst themselves to market and promote certain tax strategies to high net-worth individuals and business entities.

15.     The Enterprise arranged to solicit at least 65 high net-worth participants, including Mr. Conwill, who were induced with misrepresentations to engage in the tax strategies that they designed and to pay the Enterprise exorbitant fees for advice that the Defendants and other Members of the Enterprise knew or should have known was improper and illegal. Defendants and other Members of the Enterprise derived and distributed kickbacks from those fees.

16.     Mr. Conwill is a successful investment banker who, during his twenty-five year career and after navigating a pathway through respected investment banking firms, has built his own investment banking company based in New Orleans.[2]

17.     As later described by Mr. Gordon in an October 2003 opinion letter issued by Greenberg, in 2002 "[i]n order to diversify his portfolio and in light of general economic and geopolitical conditions, [Mr. Conwill] investigated alternative investment classes that might perform independent

---

[2]     Transcript of Deposition of Daniel Conwill, Case No. 2009-4365 (Aug. 16, 2010), at pp. 17-29.

of his existing portfolio and that might take advantage of such economic and geopolitical conditions. In addition to enhance risk adjusted returns across his portfolio, he was interested in investments that were specifically designed to generate returns not correlated to the equity, debt and real estate investments then in his portfolio."[3]

18.     In late 2002, Mr. Ohle, a licensed attorney, certified public accountant and certified financial planner, approached Mr. Conwill to offer personal financial planning services.

19.     Specifically, after consultation with Mr. Ohle and Mr. Ohle's financial advisory firm, Dumaine Consulting, LLC ("Dumaine"), regarding potential alternative investments, Mr. Conwill

> decided to make a relatively small investment (compared to his assets available for investment) in a portfolio of forward contracts (the "Forward Contracts") and options (the "Options") structured to exploit the relative price movement of two or more currencies. The primary drivers of this portfolio were the values of the Danish krone and the euro, both relative to the U.S. Dollar. In order to mitigate risk and to benefit from relatively small (decimal point) exchange rate movements, Investor's strategy included investment in highly leveraged, and hedged, positions so that large notional amounts could be invested without significant additional financial exposure. … Compared to an outright position in a foreign currency, the Forward Contracts and Options potentially produce significant profits from incremental exchange rate movements and incremental movements in interest rates while reducing the risk of catastrophic losses from such rate movements. In addition, forward contracts and options purchased over-the-counter provide tighter bid-asked spreads compared to foreign currency transactions on regulated futures exchanges. The decision to invest in any given arbitrage position typically is based on an expectation of profit from short-term movements in the relative currencies taking into account the implicit interest components inherent in the instruments.[4]

This set of transactions will be referred to in this Complaint as "the 2002 Transaction."

---

[3]     Letter from Mr. Gordon to Mr. Conwill (Oct. 10, 2003) ("Tax Opinion Letter"), GT 000512-699 at 513.

[4]     Tax Opinion Letter, GT 000512-699 at 514-15, 517.

20.     Regarding the 2002 Transaction, Mr. Conwill "believed that he had a reasonable expectation of realizing a significant pre-tax profit from his investments in the Forward Contracts and the Options[;]" he "believe[d] that he had a reasonable opportunity to make an aggregate gross return substantially in excess of the sum of [his] expenses, including consulting and investment advisory costs[;]" and his "primary purpose in acquiring the Options and the Forward Contracts was to profit therefrom independent of any tax benefits associated therewith."[5]

21.     Mr. Ohle represented to Mr. Conwill, however, that should the 2002 Transaction result in a loss, he could legitimately rely on that loss to offset tax liability for the 2002 tax year. This tax strategy will be referred to herein as "the 1256 strategy."  Mr. Ohle told Mr. Conwill that Greenberg would provide an opinion letter to Mr. Conwill as an independent analysis of the legitimacy and efficacy of the 1256 strategy, and that the letter would be issued by Greenberg after Mr. Conwill entered into the 2002 Transaction but prior to the filing of tax returns for the 2002 tax year.[6]

22.     Thereafter, Mr. Ohle introduced Mr. Conwill to Mr. Gordon and Greenberg, representing that they would offer an independent analysis of the legitimacy and efficacy of the 1256 strategy.[7]

23.     Mr. Conwill was told by Mr. Ohle and the Greenberg defendants that: (a) the 1256 strategy was based on loopholes in the tax code; (b) attorneys with a blue-chip law firm (*i.e.*, the Greenberg defendants) had independently and objectively reviewed the 1256 tax strategy; (c) these attorneys were specialists with excellent and national reputations and experience; (d) these lawyers had

---

[5]      Tax Opinion Letter, GT 000512-699 at 519-20.

[6]      Conwill Depo. Tr., at pp. 183-184 ; Deposition Transcript of David Lukinovich, Case No. 2009-4365 (Nov. 23, 2010), at pp. 130-134.

[7]      Conwill Depo. Tr., at pp. 149-151.

concluded that the 1256 tax strategy was lawful; (e) these attorneys would provide Mr. Conwill with an opinion letter attesting to the legitimacy of the tax strategy and confirming that any losses generated by the 2002 Transaction could properly be claimed as tax losses; (f) the Greenberg defendants' opinion letter, in the event of any IRS or state tax audit, would enable Mr. Conwill to satisfy federal and state auditors as to the propriety of the tax returns; and (g) the Greenberg opinion letter would serve as a protection against the imposition of tax penalties in the unlikely event the IRS or state tax authorities challenged the 1256 strategy. These misrepresentations were never corrected.

24.     Relying on the misrepresentations by the defendants, Mr. Conwill's personal attorney, David Lukinovich, also understood in December 2002, that Greenberg would provide an opinion letter to Mr. Conwill as an independent analysis of the legitimacy and efficacy of the 1256 strategy, and that the letter would be issued by Greenberg after Mr. Conwill entered into the 2002 Transaction but prior to the filing of tax returns for the 2002 tax year.[8]

25.     Mr. Conwill would not have taken a tax position on losses from the 2002 Transaction, and therefore would not have agreed to enter into the 1256 strategy, unless he knew he had an independent tax opinion letter from a very large, very well regarded international law firm.[9] Therefore, only on the basis of his understanding that Greenberg would be supplying such an opinion letter did Mr. Conwill agree to participate in the 1256 strategy.

26.     It was reasonable for Mr. Conwill to rely on the representations made by the Greenberg defendants.

---

[8]     Conwill Depo. Tr., at pp. 183-184 ; Deposition Transcript of David Lukinovich, Case No. 2009-4365 (Nov. 23, 2010), at pp. 130-134.

[9]     Conwill Depo. Tr., at p. 184.

8

27.     In December 2002, Mr. Conwill sustained significant losses due to his participation in the 2002 Transaction and implemented the 1256 strategy to attempt to use these losses to offset his tax liability for the 2002 tax year.

28.     Throughout the spring and summer of 2003, Greenberg, through Greenberg attorney Mark Zametto and others working under the supervision of Mr. Gordon, contacted Mr. Conwill and represented that Greenberg was commencing to prepare an independent opinion letter regarding the 1256 strategy.

29.     On September 15, 2003, Mr. Conwill entered into a representation agreement with Greenberg, whereby the Greenberg defendants were to provide an independent opinion as to the advisability of Mr. Conwill entering into the 1256 strategy, in exchange for which Mr. Conwill paid to Greenberg $100,000.00 in fees.

30.     Mr. Conwill had also paid significant fees to Mr. Ohle and/or Dumaine, as well as other members of the Enterprise, for purported financial advising services in connection with the 2002 transaction and/or the 1256 strategy.

31.     In a conference call on September 10, 2003, Mr. Conwill confirmed to attorneys at Greenberg that he had entered into the 2002 Transaction with an expectation of the possibility of a pre-tax return of at least 15-20% on his investment, though he also understood that there was a 50% chance that he would lose the entire investment, which is what had occurred.[10]

32.     Mr. Gordon purported to provide an independent analysis in an opinion letter issued to Mr. Conwill on October 10, 2003.

---

[10]     Jay Gordon handwritten notes (produced by Greenberg counsel on March 11, 2011), at p. GT_BK_P_GTNY3868_00078655.pdf.

33.    However, unbeknownst to Mr. Conwill, either Greenberg already had drafted an opinion letter to be used in conjunction with the 1256 strategy being promoted to multiple individuals by Mr. Ohle or Greenberg was using a draft of an opinion letter created by Mr. Ohle and other members of the Enterprise specifically for Greenberg to use in rendering its purportedly "independent" advice, and Greenberg only inserted minor additions to make the fact section of the letter appear tailored to individuals' tax opinion letters. This prefabricated opinion letter supplied by Greenberg was neither independent from the tax strategy promotion by Mr. Ohle, nor had it been drafted specifically for Mr. Conwill, as had been represented to Mr. Conwill and to his independent counsel Mr. Lukinovich and James Lynch.

34.    On October 13, 2003, Mr. Gordon, Greenberg associate Mr. Zametto, and Greenberg shareholder Barbara Kaplan authored a memo to Mr. Conwill concluding that the 2002 Transaction was "neither (1) … the same as or substantially similar to any of the 'listed transactions' which have been identified by the Internal Revenue Service at this time nor (2) contain[s] at least two of six characteristics set forth" in the tax regulations that would trigger any disclosure obligation to the IRS.[11] However, this memo was never delivered to Mr. Conwill.

35.    In March 2004, Mr. Zametto asked Mr. Gordon whether Mr. Conwill should be notified regarding any implications of then-recently issued IRS Notice 2003-81. Mr. Gordon responded that Greenberg should send "nothing more than a one page letter" advising Mr. Conwill "of the availability of filing a 'qualified amended return' and of [his] disclosure obligations."[12]

---

[11]    Memo from Mr. Gordon, Mr. Zameto, and Ms. Kaplan to Mr. Conwill (Oct. 13, 2003) (produced by Greenberg's counsel on March 11, 2011), at GT_ZM_E_GT0211_00004014.pdf.

[12]    Emails between Mr. Zametto and Mr. Gordon (March 15 & 16, 2004) (produced by Greenberg's   counsel   on   March   11,   2011),   at   Kyocera_Scans3530_000.pdf   &

36.     On March 31, 2004, Mr. Zametto circulated to Mr. Gordon and Ms. Kaplan a draft of a letter that would have informed Mr. Conwill that the 1256 strategy "likely … will be considered to be substantially similar to the 'listed transaction' described in Notice 2003-81." The March 31 draft also would have informed Mr. Conwill that such "substantially similar" transactions are subject to disclosure on the taxpayer's next income tax return and by separate disclosure to the IRS Office of Tax Shelter Analysis. The March 31 draft then would have advised Mr. Conwill of his option to file a qualified amended return prior to receiving notice of examination by the IRS.[13]

37.     Ms. Kaplan also has in her custody at Greenberg a second March 31, 2004 draft of the letter to Mr. Conwill. This second March 31 draft does not contain the conclusion that the 1256 strategy engaged in by Mr. Conwill is "substantially similar" to the Notice 2003-81 transaction; but, after describing the Notice 2003-81 transaction, concludes "we believe it is only a matter of time before you and other taxpayers who invested in these transactions will be audited by the IRS." The second March 31 draft also refers to an unrelated IRS settlement initiative regarding a "Son of Boss" tax strategy to suggest that any settlement initiative arising from Notice 2003-81 would not include an across-the-board waiver of penalties. The second March 31 draft then noted that "time is of the essence" to decide whether to submit a qualified amended return "if [Mr. Conwill] want[ed] to avoid the inevitable audit and to eliminate penalties."[14]

---

GT_ZM_E_GT0211_00004013.pdf.

[13]     Email with attachment from Mr. Zametto to Mr. Gordon (March 31, 2004) (produced by Greenberg's counsel on March 11, 2011), at GT_ZM_E_GT0211_00003990.pdf; 3989.pdf.

[14]     Unsigned draft letter from Mr. Gordon to Mr. Conwill (March 31, 2004) (produced by Greenberg's counsel on March 11, 2011), at GT_BK_P_GTNY3868_00078701.pdf.

38.     Neither March 31 draft was sent to Mr. Conwill. Instead, on April 7, 2004, Mr. Gordon significantly revised the letter and sent it back to Mr. Zametto and Ms. Kaplan to review and save on Greenberg's system. The letter as revised by Mr. Gordon eliminated any discussion of the inevitability of IRS audit or the details of possible penalties or settlement initiatives, omitted any reference to the Son of Boss tax strategy, and replaced the significant language regarding "substantial" similarity with a conclusion that the 2002 Transaction merely may be "similar to" the Notice 2003-81 transactions.[15] Mr. Gordon's new language was sent to Mr. Conwill in the final letter on April 7, 2004:

> [W]e wish to notify you that the IRS issued Notice 2003-81 last December. The Notice specified a transaction **similar to** the [2002 Transaction] as a "listed transaction" for purposes of the tax shelter regulations. Any transaction that is ***the same as or substantially similar to a "listed transaction" is subject to disclosure*** on the first filed tax return after such transaction becomes a "listed transaction[.]" … We suggest that you discuss these disclosure requirements with your return preparer.
>
> When the IRS specifies a transaction as a "listed transaction," it invokes the procedural matters set forth above ***but does not directly address the merits of such transaction from a tax standpoint***. That said, it is ***generally assumed*** that the IRS will challenge the tax consequences of every "listed transaction" ***at some point in the future***. ***The outcome of any such challenge is impossible to predict at this time***. You should be aware that, prior to any such challenge, you have the option to file a qualified amended return.

(Emphases added).[16]

39.     Due to the revised language in the April 7, 2004 letter signed by Mr. Gordon and sent by Greenberg to Mr. Conwill, Mr. Conwill believed that the 1256 strategy was neither "listed" under

---

[15]     Emails between Mr. Gordon and Mr. Zametto, cc'ing Ms. Kaplan, with attachments (April 7, 2004) (produced by Greenberg's counsel on March 11, 2011), at GT_ZM_E_GT0211_00003999.pdf, 4000.pdf, 4001.pdf, 4005.pdf, 4006.pdf, 4007.pdf.

[16]     Letter from Mr. Gordon to Mr. Conwill (April 7, 2004).

Notice 2003-81 nor "substantially similar to" a Notice 2003-81 transaction, and that there were no adverse tax consequences imminent due to his participation in the 1256 strategy.

40.     The Greenberg defendants' April 7, 2004 letter – excising the draft language regarding "substantial" similarity to listed transactions and the inevitability of IRS challenge and removing reference to possible penalties and other adverse tax consequences, while assuring Mr. Conwill that an IRS Notice of a listed transaction "does not directly address the merits of such transaction from a tax standpoint," and that there is only a "general assum[ption]" that a "listed transaction" will be subject to IRS challenge "at some point in the future," but that "[t]he outcome of any such challenge is impossible to predict at this time" – undercuts any inference that Mr. Conwill knew or should have known that any subsequent IRS inquiry into whether his participation in the 1256 strategy was a "Notice 2003-81 transaction" was an indication of likely adverse tax consequences.

41.     Greenberg applied against Mr. Conwill's $100,000 retainer time spent preparing tax opinion letters for other clients, specifically including for Mr. Ohle's own personal taxes, as well as expenses incurred for package shipment and meals between Greenberg – specifically Mr. Gordon – and Mr. Ohle. Specifically, Greenberg billed against Mr. Conwill's retainer for the time spent drafting a September 23, 2003 engagement letter to Mr. Ohle, and for the expense of Fed Ex'ing a package to Mr. Ohle on that same date.[17] Greenberg's invoicing to Mr. Conwill also shows that Greenberg billed Mr. Conwill at least for the expense of Fed Ex'ing a package to Mr. Ohle on October 15, 2003, the same date that Mr. Gordon Fed Ex'd to Mr. Ohle an opinion letter regarding Mr. Ohle's personal tax

---

[17]     Letter from Phillip A. Wittmann to Gladstone Jones, with attachments (Jan. 11, 2010), at GT000013, GT000016, GT000034, GT000035.

obligations.[18] Also, despite issuing the final opinion letter to Mr. Conwill on the tax strategies in which he engaged on October 10, 2003, Greenberg's invoicing against Mr. Conwill's fee shows continued work on "tax opinion[s]" by Mr. Gordon and other Greenberg timekeepers, including preparation of a "chart of tax shelter cases" on October 15, 2003, and a "tax opinion" by Mr. Gordon on October 16, 2003. The invoicing against Mr. Conwill's fee shows that the relationship between Mr. Gordon and Mr. Ohle was in large part funded through Greenberg's billings against Mr. Conwill's retainer. For example, Fed Ex shipments to Mr. Ohle from Greenberg attorneys were expensed against Mr. Conwill's file from May 14, September 23, October 8, October 15, and October 24, 2003 (even though Mr. Conwill did not retain Greenberg until September 2003 and the final opinion letter was sent to him on October 10, 2003).[19] Moreover, Mr. Gordon and Mr. Ohle enjoyed meals at "business meeting[s]" together in a wide variety of New York establishments on Mr. Conwill's dime, including at Saloon on October 25, 2003; at Tropica on November 14, 2003 and January 30, 2004; at Bobby Van's on November 25, 2003; at Cipriani on December 23, 2003; and at Hatsubana Park on March 1, 2004; all charged against Mr. Conwill's retainer.[20]

---

[18]     Letter from Phillip A. Wittmann to Gladstone Jones, with attachments (Jan. 11, 2010), at GT000053; *see also* Deposition Transcript of Jay Gordon, Case No. 2009-4365 (Aug. 24, 2010), at pp. 190-191, 202-203.

[19]     Letter from Phillip A. Wittmann to Gladstone Jones, with attachments (Jan. 11, 2010), at GT000015, GT000016, GT000035, GT000048, GT000053; *see also* Depo. Tr. of Mr. Gordon, at pp. 190-191, 202-203.

[20]     Letter from Phillip A. Wittmann to Gladstone Jones, with attachments (Jan. 11, 2010), at GT000054, GT000074, GT000085, GT000095.

42.     Mr. Gordon "applied multiple clients' time," including presumably work done for fifteen other false and fraudulent opinion letters for other victims of the Enterprise, to Mr. Conwill's retainer.[21]

43.     Greenberg's then-counsel, Phil Wittmann, in finally producing these records conceded on January 11, 2010, acknowledged that "[n]one of these records [the invoicing against Mr. Conwill's file] appear[] to have been sent to Mr. Conwill[.]"[22]

44.     In fact, while Mr. Conwill had been charged $100,000.00, purportedly for the preparation of an independent, unique opinion letter, the Greenberg defendants charged Mr. Ohle only $10,000.00 for the issuance of an identical opinion letter for his use of the 1256 strategy on his personal taxes.

45.     In 2007, the IRS issued a settlement statement to Mr. Conwill confirming that his participation in the 1256 strategy constituted participation in an abusive tax shelter.

46.     In October 2007, Mr. Conwill and the IRS closed on a settlement program, and at that point that Mr. Conwill first became aware of the amount of increased tax liability, interest and penalties,[23] that would result from his participation in the 1256 strategy. Mr. Conwill has identified this date as the date on which he was earliest aware of his injuries; however, he was not aware in October 2007 that the failure of the tax strategies that caused these injuries was due to the fraud perpetrated by the defendants, that the Greenberg defendants were not operating independent of Mr. Ohle and Dumaine, that the Greenberg defendants had not conducted the independent analysis of the advisability for Mr.

---

[21]     Depo. Tr. of Mr. Gordon, at p. 193.

[22]     Letter from Phillip A. Wittmann to Gladstone Jones, with attachments (Jan. 11, 2010) (cover letter).

[23]     Affidavit of Mr. Conwill, Case No. 2009-4365 (Dec. 28, 2009) (attached as Exh. 1 to Doc. No. 42).

15

Conwill to enter into the 1256 strategy, and that the defendants knew that the tax strategies would likely not survive IRS challenge. Mr. Conwill was unaware of the fraud and conspiracy between the Greenberg defendants and Mr. Ohle until much later.

47.     Mr. Gordon, along with other personnel at Greenberg, conspired with Mr. Ohle and others to design, promote, and execute certain tax strategies – including the 1256 strategy – that the defendants knew and were in the best position to know would not survive IRS scrutiny, and then induced Mr. Conwill and others to pay exorbitant fees to engage in these tax strategies. The defendants, without the knowledge of Mr. Conwill, provided kickbacks to each other out of these fees and endeavored to conceal the sham nature of the tax strategies, while Mr. Conwill suffered millions of dollars in damages in the form of adverse tax consequences and related expenses and the generation of kickbacks from the fees for the members of the conspiracy without Mr. Conwill's knowledge.

48.     On November 13, 2008, Mr. Ohle was indicted in the Southern District of New York on charges of fraud and conspiracy arising from tax strategies that he engineered, for fraudulently inducing purported clients to engage in sham tax strategies. *United States v. Ohle, et al.*, No. 08-CR-1109 (S.D.N.Y. Nov. 13, 2008). The conspiracy alleged in that Indictment specifically related to a "HOMER" tax strategy, as to which Mr. Ohle conspired primarily with the Jenkins & Gilchrist law firm, and that involved a different set of transactions and victims than did the tax strategies involving Mr. Conwill. Included in the Indictment and Superseding Indictment, however, in relation to a separate count regarding Mr. Ohle's actions to evade his own individual tax obligations, is the allegation that, "[o]n or about October 15, 2003, OHLE caused a lawyer at a law firm in New York, New York, to issue a false and fraudulent opinion letter on the transaction used by OHLE to

16

eliminate taxes due and owing on his 2002 U.S. Individual Income Tax Return."[22] The Ohle Indictment did not, however, otherwise identify the New York lawyer who authored the false and fraudulent opinion letter.

49.     On December 12, 2008, Mr. Gordon pled guilty to a conspiracy that included preparation and assistance "in preparing false and fraudulent documents to deceive the IRS, including, but not limited to, engagement letters, transactional documents, representation letters, opinion letters, and correspondence with the IRS. [Mr. Gordon and his co-conspirators] would and did make false and misleading statements in connection with efforts by the IRS to ascertain the circumstances surrounding the design, marketing, and implementation of tax shelter transactions as well as the motivation behind the client's participation in the shelter transactions...."[23]

50.     Mr. Gordon also pled guilty to one count of "corruptly endeavoring to obstruct and impede the due administration of the Internal Revenue laws."

51.     Mr. Gordon, "together with others, unlawfully, willfully, and knowingly conspired and agreed to defraud the Internal Revenue Service. Specifically, [Mr. Gordon] and others agreed to and did issue various opinion letters in connection with tax shelter transactions, including opinions of the transactions of an entity controlled by John P. Ohle, III [*sic*]. When writing these opinion letters [Mr. Gordon and his co-conspirators] incorporated false and fraudulent statements and omitted material facts."[24]

---

[22]     Superseding Indictment, *United States v. Ohle, et al.*, No. 08-CR-1109 (S.D.N.Y. Jan. 15, 2009), at ¶ 87.I.A.g (p. 40) (together with the original Indictment, "the Ohle Indictment").

[23]     *United States v. Jay Gordon*, No. 06-Crim-1246, Gordon Guilty Plea (S.D.N.Y. Dec. 12, 2008), at p. 14.

[24]     *Id*. at page 23.

52.     The Information, the allegations of which Mr. Gordon conceded in pleading guilty, further specifically noted that Mr. Gordon acted in conspiracy with Mr. Ohle, and that Greenberg was paid fees specifically for Mr. Gordon's issuance of opinion letters for the tax shelter transactions designed by Mr. Ohle.[25]

53.     Mr. Gordon pled guilty to accepting kickbacks from "tax shelter boutiques," specifically including from one operated by Mr. Ohle.[26]

54.     The Greenberg defendants issued an opinion letter to Mr. Ohle that was identical in substance to the opinion letter the Greenberg defendants issued to Mr. Conwill.

55.     As additional "Overt Acts" alleged to be part of the conspiracy, the Gordon Information includes an engagement letter from Mr. Gordon to Mr. Ohle signed on or about September 23, 2003, and an opinion letter from Mr. Gordon to Mr. Ohle regarding Mr. Ohle's personal tax obligations signed and sent via Fed Ex on or about October 15, 2003.[27]

56.     Another Overt Act set forth in the Gordon Information was Mr. Ohle's payment of a wire transfer to Greenberg on October 16, 2003.[28]

57.     In connection with the admitted activities of fraud and kickbacks, the New York Appellate Division accepted Mr. Gordon's resignation from the practice of law and struck his name from the roll of attorneys licensed to practice in New York.

58.     The Gordon Information shows a nexus with the Ohle Indictment in that the October 15, 2003 opinion letter by "a lawyer at a law firm in New York, New York" in the Ohle Indictment

---

[25]     *United States v. Jay Gordon*, No. 06-Crim-1246, Gordon Information (S.D.N.Y. Dec. 12, 2008), at ¶ 15.

[26]     *Id.*

[27]     *Id.* at ¶ 25(a) and (b).

[28]     *Id.* at ¶ 25(e).

appears to describe the October 15, 2003 opinion letter by Mr. Gordon to Mr. Ohle in the Gordon Information.

59.     Until Mr. Conwill received copies of the invoicing records in his Greenberg file on January 11, 2010, he did not have knowledge that the Greenberg defendants and Mr. Ohle used his fees for his October 10, 2003 opinion letter to fund the admitted criminal conspiracy and fraud, including many of the "overt acts" specified in the Ohle Indictments and the Gordon Information and also included in the billing records in his Greenberg file.

60.     In a deposition on August 24, 2010, Mr. Gordon admitted that he committed fraud in drafting and providing the opinion letter to Mr. Conwill.[29]

61.     Mr. Gordon also admitted to drafting five 1256 strategy opinion letter, including three that originated from Mr. Ohle, all of which contained representations that were were substantively identical.[30]

62.     Mr. Gordon's guilt-plea allocution includes the drafting of all five 1256 strategy opinion letters, as well as ten other tax opinion letters that incorporated "false and fraudulent statements" and omitted "material facts."[31]

63.     Mr. Gordon believes that Mr. Ohle knew that the representations in the 1256 strategy opinion letters were false.[32]

64.     Mr. Ohle's indictment resulted in his conviction on June 2, 2010, after a lengthy trial, of all three counts against him, including a conviction related to Mr. Ohle's participation in the 1256

---

[29]     Depo. Tr. of Mr. Gordon, at pp. 102-111, 250; Allocution, *United States v. Gordon*, No. 08-CR-1246 (Dec. 12, 2008) ("Allocution").
[30]     Depo. Tr. of Mr. Gordon, at pp. 24-25, 27, 159.
[31]     Depo. Tr. of Mr. Gordon, at pp. 104-107, 149.
[32]     Depo. Tr. of Mr. Gordon, at pp. 118-119.

strategy that is at issue in this case. Mr. Gordon testified at the Ohle criminal trial regarding the work he did for Mr. Ohle related to the 1256 strategy.

65.     On June 25, 2010, Mr. Conwill received copies of more than one thousand exhibits introduced at Mr. Ohle's trial, which included documents essential to Mr. Conwill's claims, including a copy of the tax opinion letter that Mr. Gordon issued to Mr. Ohle that is identical in substance to the opinion letter Mr. Gordon provided to Mr. Conwill, showing that the Greenberg defendants actually did not endeavor to perform the independent legal analysis that they agreed to provide to Mr. Conwill.

66.     The information learned during and subsequent to the Ohle criminal trial also shows that Count 2 from Mr. Gordon's guilty plea is relevant to Mr. Conwill's claims here, and specifically addresses a conspiracy between Mr. Gordon, Mr. Ohle, and others related to the 1256 strategy they promoted to Mr. Conwill.

67.     Greenberg, Gordon and Ohle were a part of an  Enterprise that centered around the sale of investments and a variety of tax strategies to high net worth individuals such as Mr. Conwill. While there were numerous co-conspirators, the goals of the Enterprise were the same – to create income for its members through fees and undisclosed commissions and kickbacks from the sale of risky and illegal investments and tax strategies. One arm of this Enterprise was that which involved Mr. Ohle, Greenberg, and Mr. Gordon and which caused the damage at issue to Mr. Conwill.

68.     Mr. Ohle introduced Mr. Conwill to the Greenberg defendants on the pretense that the Greenberg defendants would provide "independent" counsel to Mr. Conwill as to the advisability of entering into the 1256 strategy – a strategy that Mr. Ohle, the Greenberg defendants, and other co-conspirators had themselves designed and developed for the illegal purpose of obtaining exorbitant

fees, and that the defendants knew or should have known would be deemed improper by the IRS at the time that they designed the strategies and purported to render their advice to Mr. Conwill.

69.     Members of the Enterprise, including Mr. Ohle and the Greenberg defendants, were biased by their own interests, pecuniary motive, and gain.

70.     Mr. Gordon and other attorneys employed by Greenberg did not provide the services they contracted to provide to Mr. Conwill, in that they did not provide independent analyses tailored to Mr. Conwill's participation in the 2002 Transaction or the 1256 strategy.

71.     Moreover, Mr. Gordon and other attorneys employed by Greenberg violated duties they owed Mr. Conwill by committing intentional fraud and by failing to disclose their conflicts of interest; their role in devising the tax strategy at issue; their reliance upon Mr. Ohle, the promoter, for the basis of their purportedly unbiased opinion letter; and the unreasonableness of their fees in light of their use of a prefabricated opinion letter and their charging against Mr. Conwill's fee the expenses incurred and fees for services rendered for other clients and in furtherance of their fraudulent activities and participation in the Enterprise.

## LITIGATION BACKGROUND

72.     On July 9, 2009, Mr. Conwill filed his initial Complaint against the Greenberg defendants and Mr. Ohle, in this Court, Docket No. 09-4365, invoking this Court's federal question jurisdiction in raising a claim against the defendants under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, § 901(a) of Title IX of the Organized Crime Control Act of 1970, as amended; and invoking this Court's supplemental jurisdiction over state law claims of legal malpractice, fraud, civil conspiracy to commit fraud, breach of contract, and breach of fiduciary duty.

73.    Though Mr. Conwill subsequently determined that what he thought was the impediment to invoking this Court's diversity jurisdiction – that he thought Mr. Ohle was a Louisiana citizen – was incorrect, this Court denied Mr. Conwill's attempts to amend his Complaint to assert diversity jurisdiction over his state law claims.

74.    On December 22, 2009, this Court denied Mr. Gordon's motion to dismiss the Complaint as to him for lack of personal jurisdiction, finding that, because Mr. Conwill's claims were premised on the fact that communications directed to him in Louisiana were themselves the basis for the tortious conduct at issue, the Greenberg defendants purposefully availed themselves of the benefits and protections of this jurisdiction.[33]

75.    On July 29, 2010, this Court denied motions for summary judgment filed by the Greenberg defendants as to Mr. Conwill's RICO claims on the basis of RICO's four-year statute of limitations, finding that neither the April 7, 2004 Greenberg letter nor subsequent communications constituted "storm warnings" that would have put Mr. Conwill on notice of his injuries more than four years prior to filing of his Complaint, and finding that Mr. Conwill did not have knowledge of his injuries prior to October 2007.[34]

76.    On July 29, 2010, this Court also denied the Greenberg defendants' motions for summary judgment as to Mr. Conwill's claim for breach of fiduciary duty, finding that the periods applicable to traditional legal malpractice claims under La. R.S. § 9:5605 were inapplicable to attorneys not licensed to practice in Louisiana; and that the ten-year prescriptive period under Louisiana Civil

---

[33]    Order, Case No. 2009-4365 (Dec. 22, 2009) (Doc. No. 32).
[34]    Order, Case No. 2009-4365 (July 29, 2010) (Doc. No. 158).

Code article 3499 applied to the breach of fiduciary duty claim because the alleged breach was in the nature of deliberate fraud.[35]

77.     However, also on July 29, 2010, this Court granted the Greenberg defendants' motions for summary judgment as to Mr. Conwill's state law claims for legal malpractice, fraud, civil conspiracy to commit fraud, and breach of contract, finding that a one-year prescriptive period under Louisiana Civil Code article 3492 applied to those claims and that Mr. Conwill's admission that he had knowledge of his injuries in October 2007 precluded application of *contra non valentem* past that point.[36]

78.     The Greenberg defendants subsequently moved again for summary judgment on Mr. Conwill's RICO claim, again asserting application of the four-year statute of limitations, as well as that the bar to assertion of RICO claims under the PSLRA for causes of action that could be pursued as securities fraud barred Mr. Conwill's RICO claims. On March 22, 2011, this Court granted the Greenberg defendants' summary judgment motion on the PSLRA basis, but did not re-address its earlier holding as to the inapplicability of the four-year statute of limitations to bar Mr. Conwill's claim. This Court also dismissed without prejudice any remaining state law claims by Mr. Conwill, specifically including the breach of fiduciary duty claim, on the basis that diversity jurisdiction had not been invoked and the only claim invoking this Court's original jurisdiction – the RICO claim – had been dismissed. The Court directed that its dismissal of the remaining state law claims was without prejudice to Mr. Conwill's ability to re-file.[37]

---

[35]     *Id*.
[36]     *Id*.
[37]     Order, Case No. 2009-4365 (March 22, 2011) (Doc. No. 328).

79.    Because complete diversity exists as to Mr. Conwill's remaining state law claims – his previously pled breach of fiduciary duty claim as well as his claim asserted here under the Louisiana Racketeering Act – Mr. Conwill now refiles those claims in this federal Court.

80.    Only in the dusk of the initial litigation did the Greenberg defendants reluctantly produce to Mr. Conwill materials that should have been in his file and produced to him long before, and even that litigation-driven production was halting and staggered.

81.    For example, even though Mr. Conwill had been asking for a complete copy of the accounting related to his Greenberg file since December 2008, Greenberg did not provide the invoicing records that showed the charge of numerous expenses and fees against his retainer until January 11, 2010.

82.    As further example, on March 11, 2011, less than two weeks before Mr. Conwill's initial Complaint was dismissed, Greenberg produced 1,030 pages of documents that had been referenced on a privilege log produced by Greenberg in related arbitration proceedings between it and its malpractice carrier. Included in these documents were more than 200 pages of documents never before produced to Mr. Conwill, critically including the multiple drafts of the April 7, 2004 letter that showed Greenberg's active attempts to withhold from Mr. Conwill any notice that his reliance on the October 10, 2003 opinion letter would result in adverse tax consequences. These documents also belied the deposition testimony of Ms. Kaplan that she had not had any participation in the representation of Mr. Conwill.

## FIRST CAUSE OF ACTION:
## CIVIL VIOLATIONS OF
## THE LOUISIANA RACKETEERING ACT

83.     The allegations contained in paragraphs 1 through 82 of this Complaint for Damages are incorporated herein by reference.

### The Racketeering Enterprise

84.     The enterprise at issue in this case, for purposes of La. R.S. § 15:1353, is an association-in-fact of all unnamed co-conspirators and the defendants – "Members of the Enterprise" – collectively referred to herein as "the Enterprise." The wrongdoers that were part of the association-in-fact Enterprise include the defendants, banking institutions and investment associations, law firms that issued the opinions, and accountants that reviewed the strategies, as well as those employees and agents of Members of the Enterprise and other non-defendant entities that participated in the unlawful and undisclosed fee sharing. At times throughout the years that the Enterprise conducted these schemes, the number of Members conspiring and colluding in the Enterprise fluctuated because the Enterprise would newly solicit some additional co-conspirators and discharge others, in order to increase profitability.

85.     While the defendants participated in the Enterprise and were a part of it, the defendants also have an existence separate and distinct from the Enterprise.

86.     The defendants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

87.     The defendants' control and participation in the Enterprise were necessary for the successful operation of The defendants' scheme.

25

88.     The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the defendants engaged.

89.     The defendants and all other Members of the Enterprise shared fees, costs, information, resources, and the fruits of its predicate acts. The association-in-fact Enterprise, composed of the defendants and other Members of the Enterprise, had a formal, ongoing relationship that functioned as a continuing unit, pursuing the course of conduct as set forth above (*i.e.,* the pursuit of customer prospects, the promotion and the sale of the series of investments and tax strategies and, importantly, the sharing of fees, commissions, and kickbacks), with a common or shared purpose (*i.e.*, to convince potential clients that the strategies would decrease or eliminate those clients' tax liabilities when in fact they would not, all the while charging exorbitant fees for the shared benefit of the Members of the Enterprise) and continuity of structure and personnel (including partners, associates, and support staff).

90.     The defendants and those employed by and/or associated with the Enterprise have conducted the affairs of the Enterprise through a pattern of racketeering activity in violation of La. R.S. § 15:1353(a), (b), and (c), and have conspired to violate § 15:1353(c) in violation of § 15:1353(d) by pursuing and soliciting clients, designing, creating, engineering, implementing, marketing, promoting, and/or selling and inducing the purchase of transactions that were designed to reduce or eliminate tax liability and that were determined by the IRS to be illegal and/or abusive tax shelters under IRS Notice 2003-81, 2003-51 IRB 1223 and/or other IRS Notices or Announcements, and by collecting exorbitant fees therefor.

91.     The defendants have violated La. R.S.§ 15:1353(d), inasmuch as they knowingly, intentionally, and unlawfully aided and abetted each other and the Enterprise and conspired to

conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise, through the pattern of racketeering activity described herein.

## The Scheme

92.    As set forth above, for a substantial period of time Members of the Enterprise knowingly, intentionally, and directly participated in, or aided and abetted, counseled, commanded, induced, procured, or caused and conspired in the pursuit of and solicitation of and eventual inducement of clients to participate in tax strategies that were purportedly designed to reduce or eliminate tax liability for their clients by means of false or fraudulent representations or promises by the use of the mails and/or wires for purposes of the execution of their scheme, and for the purpose of obtaining exorbitant fees that were shared among the co-conspirator Members of the Enterprise.

93.    The particulars of the scheme as set forth above were achieved by means of false or fraudulent representations or promises and through the use of the mails and/or wires. These false and fraudulent representations include, but are not limited to, the following:

    a.    In December 2002, Mr. Ohle communicated to Mr. Conwill and Mr. Conwill's representatives that the 2002 Transaction included the opportunity to realize a 15-20% return, even though Mr. Ohle knew that Mr. Conwill would more than likely lose his entire investment.

    b.    In December 2002, Mr. Ohle communicated to Mr. Conwill and Mr. Conwill's representatives that the Greenberg defendants would provide an independent opinion letter advising Mr. Conwill that using any loss from participation in the 2002 Transaction as a basis for the 1256 tax strategy would not be found to be impermissible by the IRS.

c.   Beginning in December 2002, throughout the Spring and Summer of 2003, and in multiple communications in August, September, and October 2003, the Greenberg defendants represented to Mr. Conwill that (i) they would provide an independent analysis of the 1256 strategy; (ii) the 1256 strategy would not be found to be impermissible by the IRS, even though the Greenberg defendants knew or were in a position to know that the 1256 strategy would be considered impermissible; (iii) they were acting independently of tax strategy promoter Mr. Ohle; and (iv) that Mr. Conwill could rely on the Greenberg opinion letter as protection from additional tax liability in the event of any IRS challenge to his participation in the 1256 strategy. All of these representations were false and fraudulent, as the Greenberg defendants were not operating independent of Mr. Ohle, the analysis they provided was not prepared uniquely and independently for Mr. Conwill, and the Greenberg defendants knew or should have known that the 1256 strategy would not be found permissible by the IRS.

d.   The Greenberg defendants used the exorbitant fee charged to Mr. Conwill to fund other activities critical to the Enterprise, including expenses and fees for the generation of additional fraudulent tax opinion letters, subsequently admitted by Mr. Gordon to be fraudulent, and meetings with and shipments to Mr. Ohle to further the scheme and the pattern of racketeering activity.

e.   In April 2004, the Greenberg defendants concocted a new communication to Mr. Conwill to fraudulently misrepresent to him that IRS Notice 2003-81 was not a trigger of adverse tax consequences arising from the participation in the 1256 strategy.

28

f.      Neither Mr. Ohle nor the Greenberg defendants informed Mr. Conwill that they were

using the exorbitant fees each charged to Mr. Conwill to generate kickbacks to each

other and to other members of the Enterprise, nor that they were using the proceeds

of his fees to fund further fraudulent activities.

**Predicate Acts**

94.   With respect to the activities alleged herein, the Enterprise acted at all times with malice

toward Mr. Conwill, with the intent to engage in the conduct complained of for the monetary benefit

of the defendants and other Members of the Enterprise. Such conduct was done with actionable

wantonness and reckless disregard for the rights of Mr. Conwill. The predicate acts were acts of

deception that furthered the goal of soliciting clients to pay for participation in what the Enterprise

knew or should have known was a fraudulent tax shelter transaction that would be deemed abusive

by the IRS.

95.   With respect to the activities alleged herein, the Enterprise sought to aid and abet and actually

did aid and abet a transaction to violate La. R.S. §§ 15:1353(a), (b), and (c), and specifically (without

limitation) La. R.S. §§ 14:67 and 14:230. In Mr. Conwill's federal RICO claim in his first lawsuit

against the defendants, this Court found the federal RICO claim to be barred because it found that

the claims involved claims actionable as securities fraud and therefore subject to the PSLRA bar

against federal RICO claims. As of the filing of this new Complaint for Damages, Mr. Conwill is

appealing that judgment on the basis that the 2002 Transaction did not involve the sale of securities

and that the claims raised originally were therefore not actionable as securities fraud. Should Mr.

Conwill not prevail on that appeal, however, under the Louisiana Racketeering Act – unlike under

federal RICO – actions in violation of the Louisiana Securities Act are specifically deemed to be

"racketeering" acts that are predicate acts under the Louisiana Racketeering Act. La. R.S. §§ 15:1352(A); 51:712.[38]

96.    With respect to the overt acts and activities alleged herein, each Member of the Enterprise conspired with each other co-conspirator entity to violate La. Rev. Stat. §§ 15:1353(a), (b) and (c), all in violation of La. Rev. Stat. § 15:1353(d). In violation of § 1353(c), each Member of the Enterprise agreed and conspired with each other Member to: a) pursuant to § 1353(a), invest fees paid by Plaintiff into pursuing and soliciting other clients, inducing and causing other individuals and business entities to pay for the tax advice at issue; and b) pursuant to § 1353(b), acquire or maintain property interests to which the Enterprise was not entitled through racketeering activity which included charging and sharing exorbitant fees for tax strategies it knew or should have known would be deemed unacceptable by the IRS.

97.    The Enterprise and its individual Members exceeded any legitimate role of diligent tax advisers by designing, creating, engineering, implementing, marketing, promoting, and/or selling a series of these tax strategies – the fraudulent nature as to many of which Mr. Gordon has already pled guilty and Mr. Ohle has already been convicted – in an attempt to conspire to obtain money in the form of fees and commissions, knowing that the underlying strategies were likely not defensible to the IRS.

---

[38]    *See Metz v. United Counties Bancorp*, 61 F. Supp. 2d 364, (D.N.J. 1999) (upon dismissing a plaintiff's federal RICO claim on PSLRA grounds, holding that the same bar could not be applied to dismiss the plaintiff's New Jersey state RICO claim because "the Court is constrained by its deference to the New Jersey state legislature, which has yet to follow Congress and focus the statute more narrowly to its enumerated purpose."). Similarly here, not only has the Louisiana Legislature not followed Congress' lead by expressly limiting out of its state anti-racketeering statute securities violations, but it has amended its statute to specifically include securities violations within the scope of the state statute.

98.     In fact, pursuant to Mr. Gordon's guilty plea and allocution, he admitted to a conspiracy that included preparation and assistance "in preparing false and fraudulent documents to deceive the IRS, including, but not limited to, engagement letters, transactional documents, representation letters, opinion letters, and correspondence with the IRS."[39]

99.     In addition, Mr. Gordon "and others agreed to and did issue various opinion letters in connection with tax shelter transactions, including opinions of the transactions of an entity controlled by John P. Ohle, III [sic]. When writing these opinion letters [Gordon and his co-conspirators] incorporated false and fraudulent statements and omitted material facts."[40] The opinion letter issued by the Greenberg defendants to Mr. Ohle was identical in substance to the opinion letter issued to Mr. Conwill.

100.    The Enterprise was in the best position to know that these strategies were potentially illegal and/or abusive, yet charged the exorbitant fees anyway.

101.    The Enterprise knew, should have known, and was in the best position to know that these strategies would not withstand the challenge and/or scrutiny of the Internal Revenue Service.

102.    The Enterprise failed to reveal to Mr. Conwill that his fees were used to generate and fund further fraudulent activities of the Enterprise; or that there were at least 65 other victims of the Enterprise.

103.    The Enterprise's schemes have resulted in millions of dollars in severe financial and business losses to Mr. Conwill. Moreover, as a result of the Enterprise's violations of Louisiana law, Mr. Conwill has suffered extensive monetary damages consisting of unexpected tax liability, fees, and

---

[39] Gordon Guilty Plea at page 14.
[40] *Id*. at page 23.

commissions paid to the Enterprise, as well as interest and penalties demanded by the Internal Revenue Service. Mr. Conwill has also suffered additional damages, including but not limited to opportunity costs, additional legal, tax advisor, and accountant fees, and reputation damage.

104.    As specified above, the Enterprise's documents and communications associated with the schemes at issue contained false and/or misleading representations.

105.    These misrepresentations constitute fraudulent, tortious, and illegal acts as defined by Louisiana law, including but not limited to violations of La. R.S. La. Rev. Stat. §§ 14:67 and 14:230.

106.    All of the Members of the Enterprise actively participated in this elaborate and abusive scheme to obtain money from Mr. Conwill, including the defendants herein and others who are not named as defendants to this matter.

107.    The numerous predicate acts of fraud and other actions violative of Louisiana law described herein are part of separate fraudulent transactions by the Enterprise designed to defraud Mr. Conwill of money and property interests under false pretenses. As the victim of these unlawful patterns of illegal behavior, Mr. Conwill has continued to suffer losses.

108.    In carrying out the overt acts and fraudulent transactions described herein, the Enterprise engaged in conduct in violation of various Louisiana laws and regulations.

**Pattern of Racketeering Activity**

109.    The violations set forth herein constitute "racketeering activity" within the meaning of La. R.S.  §§ 15:1352 and 1353.

110.    The Enterprise has engaged in a "pattern of racketeering activity," as defined in La. R.S.  §§ 15:1352 and 1353, by committing and/or conspiring to commit or aiding and abetting a transaction with at least two such acts of racketeering activity, as described specifically herein, within the past

ten years. Each act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting similar victims, including Mr. Conwill.

111.    The Enterprise's innumerable racketeering activities or predicate acts are related and also amount to a continuous criminal activity.

112.    These predicate acts are related in the sense that they have the same purpose (to carry out the scheme described herein); result (to obtain money); victims (such as Mr. Conwill and at least 65 others); method of commission (the scheme described herein); and are otherwise interrelated by distinguishing characteristics and are not isolated events, because they were carried out for the same purpose.

113.    The Enterprise induced at least 65 participants, including Mr. Conwill, to engage in the 1256 strategy.

114.    The predicate acts were committed in the same manner, and they constituted the Enterprise's "normal" way of doing business with regard to pursuing and soliciting clients, inducing them to participate, purporting to provide "independent" verification of the tax strategies and then giving fraudulent tax strategy advice.

115.    The related predicate acts amount to a continued criminal activity because they extended over a substantial period of time.

116.    The Enterprise's course of action entails a span of years, during which the defendants committed numerous, related predicate acts, as set forth specifically herein, as part of the Enterprise's continuing scheme. Also, the predicate acts are closely intertwined as far as actors,

goals, nature, functioning, and structure of the operations described herein in the persecution of Mr. Conwill and the Enterprise's other victims.

117.    The multiple acts and the continuity and relatedness of racketeering activity committed and/or conspired to or aided and abetted by unnamed co-conspirators and the defendants, as described herein, were related to each other, amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity" within the meaning of La. R.S. §§ 15:1352 and 1353.

118.    Due to the defendants' violations of the Louisiana Racketeering Act, and Mr. Conwill's millions of dollars in losses and damage caused by those violations, the defendants are each solidarily liable to Mr. Conwill for the amount of those damages, treble damages, and his attorneys' fees and costs in pursuing this action. La. R.S. § 15:1356(E).

## SECOND CAUSE OF ACTION:
## BREACH OF FIDUCIARY DUTY

119.    The allegations contained in paragraphs 1 through 118 of this Complaint for Damages are incorporated herein by reference.

120.    Members of the Enterprise, including Mr. Ohle and the Greenberg defendants, were Mr. Conwill's fiduciary, and, as such, owed Mr. Conwill the duties of honesty, loyalty, care, and compliance.

121.    Mr. Gordon acknowledges that he owed fiduciary duties to Mr. Conwill, and that Greenberg owed fiduciary duties to Mr. Conwill.[41]

---

[41]    Depo. Tr. of Mr. Gordon, at pp. 42-44, 72-74.

34

122.    Attorneys employed by the Greenberg defendants had a significant pecuniary interest in inducing Mr. Conwill to enter into the tax strategies, and to do so, promised, opined, and assured that the transactions would enable Mr. Conwill to lawfully reduce taxes. These defendants did not disclose to Mr. Conwill that their representation of him would be materially limited and impaired by their own interests in the transactions.

123.    The Greenberg defendants' actions in purporting to represent Mr. Conwill violated their fiduciary duties of care, honesty and loyalty.

124.    For specific example, Mr. Gordon acknowledges that copying the tax opinion letter for Mr. Conwill from a faxed copy he received from Mr. Ohle via Royal Mail Service would be a breach of the Greenberg defendants' fiduciary duties.[42]

125.    The Enterprise breached its fiduciary duties to Mr. Conwill by advising Mr. Conwill to pay exorbitant fees to engage in the tax strategies designed, created, engineered, implemented, marketed, promoted, and/or sold by the Enterprise in reliance on its advice, representations, recommendations, instructions, and opinions, which the Enterprise knew or should have known to be improper and illegal.

126.    The Enterprise breached its fiduciary duties to Mr. Conwill by committing the intentionally fraudulent acts and/or omissions set forth above, including without limitation representing to Mr. Conwill that the 2002 Transaction had a realistic possibility of positive financial return, and that the 1256 strategy would be permissible; representing to Mr. Conwill that the opinion letter would be rendered by Greenberg independently of Mr. Ohle, that the opinion letter would be specific and unique to Mr. Conwill, and that Mr. Conwill's fee was required solely to fund this work; providing

---

[42]        Depo. Tr. of Mr. Gordon, at pp. 65, 76-77.

an opinion letter that incorporated intentionally false and fraudulent statements and omitted material facts; and providing further intentionally false assurances to Mr. Conwill that he would not incur adverse tax consequences from his participation in the 1256 strategy.

127.    As a result of the Enterprise's conduct set forth herein, Mr. Conwill has suffered injury in that he, among other things: a) paid to the defendants and other Members of the Enterprise exorbitant fees, b) took undue financial risk, c) incurred tax penalties and interest, d) incurred opportunity costs; e) incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation, f) incurred reputation damage, and g) has foregone alternative tax opportunities.

128.    As proximately caused by the foregoing, Mr. Conwill has been injured in an actual amount to be proven at trial, and should be awarded damages in accordance with the evidence, plus attorneys' fees and costs.

129.    In addition, the breach of fiduciary duty caused by the intentional fraud of the defendants triggers New York law regarding punitive damages. Pursuant to La. Civil Code articles 3546 and/or 3547, New York law is applicable here to entitle Mr. Conwill to an award of punitive damages. Greenberg is domiciled in New York, the injury-causing conduct by the Greenberg defendants was committed in New York and directed to Mr. Conwill in Louisiana, and New York law authorizes punitive damages for the defendants' fraudulent and intentional acts that comprise the breach of fiduciary duty.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff respectfully prays that, after all due proceedings, the Court enter judgment:

    a.    As to the Louisiana Racketeering Act claim, a judgment in favor of Plaintiff and against each Defendant jointly and severally and *in solido* with all unnamed co-conspirators, for actual damages in an amount to be proven at trial, plus treble damages, attorneys' fees, interest and costs;

    b.    As to the defendants' breach of fiduciary duties, a judgment awarding costs, expenses and reasonable attorneys' fees in favor of Plaintiff and against Defendants to the fullest extent authorized by law, including an award of punitive damages; and

    c.    granting such other and further relief which the Court deems necessary and proper at law and in equity.

    d.    The Plaintiff demands that his claims be by jury trial.

Dated: April 20, 2011.

    Respectfully submitted,

    /s/ Harvey S. Bartlett
    **GLADSTONE N. JONES, III (#22221)**
    **LYNN E. SWANSON (#22650)**
    **HARVEY S. BARTLETT (#26795)**
    **EMMA ELIZABETH ANTIN DASCHBACH (#27358)**
    **CATHERINE E. LASKY (#28652)**
    **JONES, SWANSON, HUDDELL & GARRISON, L.L.C.**
    601 Poydras Street, Suite 2655
    New Orleans, Louisiana 70130
    Telephone: (504) 523-2500
    Telecopier: (504) 523-2508

    **Counsel for Plaintiff**